Okay, now we've got the big case. Okay, now I think the easiest segue is to stay with this issue. As you know, the big case has essentially two areas. One is this same termination issue, and the other is the interim control mechanism called exposure management. I'm going to stay with the termination issue. I think that would be the easiest. The first thing we did is we moved for summary judgment on this issue. This comes up on cross motions, not stipulated facts, but cross motions. We moved for summary judgment citing as our main authority but not our sole ground the Sandberg decision from the Ninth Circuit when it came down shortly thereafter. We cited Sandberg, which was a memorandum opinion and therefore was only applicable in collateral estoppel. We cited it in collateral estoppel, and we also cited Sherman and Jack Rowe, which were cited by Sandberg. So we said here's the Ninth Circuit jurisprudence on this subject. Sandberg also cited Wallace, the California State Court, and we said, and this is the California State jurisprudence from the Court of Appeal that Sandberg adopted. So we had Sandberg citing Wallace, Sherman, and Jack Rowe, and we moved for summary judgment in collateral estoppel. We analyzed the applicability of Sandberg in collateral estoppel under U.S. v. Weems. The district court disagreed with us and determined that, albeit U.S. v. Weems appears to describe the same situation, you could get around U.S. v. Weems. I think that was an error of law by the district court. I don't think you can get around U.S. v. Weems. U.S. v. Weems, in essence, said, even though, when you want to use a decision in collateral estoppel, even though the decision ultimately went against the party using it on the other ground, and even though, theoretically, the Ninth Circuit could have just jumped to the cause issue and skipped over, even though those are true where, in fact, the court has authoritatively and carefully dealt with the first issue, which is whether it should be summarily dismissed as terminable at will. I guess the test is whether it was necessary to the decision. Well, in Weems, I think Weems is the one that sets up the exception. What Weems says is it's not necessary. It doesn't have to be theoretically necessary to the decision. It just had to have been thoroughly considered. And remember, Weems was talking about the way the situation normally arises, which is with a trial court. Here we have the appellate court doing it, taking it de novo. They took the first issue de novo. Now, in Weems, what happened is it was a marijuana case, and there were apparently two grounds for possible forfeiture. What Weems did is they said, on ground one, we'll go the defendant's way, but on ground two, we'll award the forfeiter. And the collateral estoppel issue was about ground one. Same thing here. Sandberg said on ground one, which is whether it's terminable at will, summarily dismissible. The trial court there did exactly the same thing as the trial court here. They said, no, we think it's not. We think it's reasonably susceptible. In fact, at one point they said we think it's terminable for cause. But they said, now we go to ground two. So they actually went in sequence, and they actually sort of had to come through ground one in order to get to the cause, because if they had gone State Farms Way on ground one, you never had to get to the cause. What happened in this case is the trial court went State Farms Way on ground one. Ground two has never come up. So it's exactly Williams. And not only that, it's the Ninth Circuit. It's the appellate court. Now, the other thing that the trial court used to get around was the stark landscape theory. The trial court said, well, all these other cases went the other way, and so Sandberg exists as a lone figure in a stark landscape that goes the other way. But when you really pick that apart, and we did in our briefs. You can walk right through the cases. First, there were a string of cases. State Farm has been winning this issue summarily on the plain meaning without any extrinsic evidence for several years. They did one in New Hampshire. They did one in New Mexico. It's Mooney and Melnick. They came through those cases. All those were before the Ninth Circuit and Sandberg. They were all cited there. And then they had some new ones. They had Gardner from Alabama. Again, no extrinsic evidence. Employment at will doctrine trumps everything. Same thing in Nevada. But as far as the relevant case law where you're considering extrinsic evidence, the only California case that has been cited recently was Lawton, L-O-T-T-E-N. State Farm in Sandberg, and I notice they did it again here. They said, here's Lawton. That goes our way too. But if you actually look at Lawton, and we supplemented it, we did the tentative and the final, and you read the two together, what happened in Lawton is the court said, I think it is reasonably susceptible to both ways. However, there is a trump here. Lawton has admitted in a deposition State Farm's position. And so for that reason, not a reason present here, for that reason, we go State Farm's way. So Lawton is actually on our side. Now, there is a case from 1981 where there was obviously no consideration of all this extrinsic evidence. The record of the case shows that. So here's the lineup, the scorecard you seem to have. You've got Sandberg and Lawton, which are consistent, and you have a 1981 case, which was a California case, but where the extrinsic evidence wasn't considered. And that's it. The rest of it is other states, plain-meaning states, not the same methodology. So we think U.S. v. Williams controls. There's no stark landscape, or if there is, the landscape tilts our way. And we think if you back up, it's not just Sandberg by itself. If you back up Sandberg with Sherman and Jack Rowe, one of which was also an insurance agent case, termination case, and you put in Wallace, you're there. And State Farm cited Bianchi. Bianchi is another court of appeal case. Bianchi and Wallace disagree, but Bianchi criticizes Wallace in dicta only. And they're peers. Bianchi hasn't thrown Wallace out. They're just peers. The Ninth Circuit handled that, too, in Sandberg. They specifically declined Bianchi. So we don't think there's anything in the way of U.S. v. Williams being applied in its full rationale and State Farm being taken out by Sandberg in collateral estoppel. But in case they're not, in case they're not, we then go to the next part. What has the district court got in front of it in the way of extrinsic evidence? Well, as we see it, putting Keller aside, it's virtually impossible for the district court to say it can't envisage a scenario under which the plaintiffs could prevail, because you still had the 1954 contract being revised in 1966. We didn't have Keller's explanation as to why they did it to assure the agents they wouldn't be terminated arbitrarily. We didn't have that, but we had the fact of the revision. I mean, you must take out with or without cause. That's not a frivolous thing to do, to take that out of a termination clause. We had Johnson, Earl Johnson, the head of agency in 1977, say termination is never approved without a serious breach of the contract, virtually his exact words. And we had the agency executive manual. Now, the Johnson communication was in an organ called the reflector, which is their official communique to the agents. So he's communicating right to the agents, telling them what to believe. That's the purpose of his article. The other one was an internal, the agency executive manual. But in the internal, it was kind of interesting. They said, well, what we did when we switched this contract is we made it, we gave them kind of a for-cause contract with flexibility. That's the way it phrased it. So we had all that. And what State Farm had on its side thrown in right at the end in a reply brief was the Joslin Declaration. All the time up until that very last reply brief, State Farm never addressed this issue. And then finally, I guess we have to have something on this. So in came Joslin, a declaration, nothing contemporaneous about it. It was written solely for the litigation at the last minute. He's a vice president of the company. He's doing his job. And he says the removal of with or without cause was not important. It didn't mean anything. It was non-substantive. Now, just put Keller aside and look at that lineup. This is summary judgment. It seems to me almost impossible that the court can say, I can't envision such scenario that would arise from your evidence. In fact, I guess I would look at it this way. They put Joslin in there to dodge summary judgment for us. That's the way I would look at it. If they hadn't thrown that thing in the last minute, they wouldn't have anything at all on it. So net of all this is I believe that the district court is reversible without Keller. And as you suggested in the beginning, I thought we might as well go in this order because you're going to have to go back and do it today. But I think you can moot the first case and reverse it without Keller. Keller then comes into play if there isn't enough there to reverse without him. And I think if you put Keller in, you know, I just don't see how. Olander, I give Olander a brief mention. I argued the Olander case in the Eighth Circuit. This is the one that came down two to one that the contract was reasonably susceptible to a broader reading. This was under North Dakota law. North Dakota allows zero examination of extrinsic evidence. It's the most, if I can use my phrase, backward. If everybody's coming toward California, which is the way I like to look at it, and they're all in stages of transition, and North Dakota's the one that hasn't moved an inch. We got a two to one panel decision there in our favor. It went to the M-Bank, got turned around. But if you look at the Olander decision itself, the majority says right in it. If this was the Ninth Circuit, it would be different. You're just right there. They slam against us or what? I do not believe so. I'll tell you, I never heard, not one time did I hear anything like wacky California. I never heard that. All I heard was we're North Dakota, that's California. That was it. That was it. There was no pejorative. I think it's implicit. Yes, well, I didn't hear it. Not even the Ninth Circuit would buy this. It'd be wrong to say that. Well, you know, Judge Loken was determined to take us out. And I'll be honest with you, I didn't hear it. For whatever that's worth, I didn't hear it. The dissent, because it was still either an eight to four or nine to three, I've forgotten. The dissent, interestingly, put Keller into the equation in that decision and said, by the way, look at some of this extrinsic evidence here. You know, trying to say, come on, guys. What about the placement of other business, the implied covenant of good faith and fair dealing? Let me move to that issue. By the way, I just don't want to lose track of one thing. In case, after all this, it's still not reversible on the breach of contract, there is a covenant of good faith and fair dealing aimed at the termination. I can handle this in just a few seconds. Essentially, you can look at the briefs and see the cases, but essentially, California and many other places recognize that if you presume a termination at will power, you can still violate the covenant if that power is used in a course of dealing to take you out of other contract benefits. This is recognized by Goose v. Bechtel. If you read the Goose case carefully, you'll see them refer to a line of well-developed California cases that say, yeah, termination at will, fine, but, you know, you can't use one contract power to gut the rest of the contract. And that is our backup theory, if you will, with respect to termination. Okay. The other issue, this is counts one and two. Now we're talking about a set of plaintiffs for whom termination has not become the big deal yet because they haven't been terminated as of the time of this action. What happened is State Farm had to pay some big claims as a result of hurricanes and earthquakes. It still had a fairly hefty surplus, but it had to pay some big claims. And the case does not show all the internal thinking of State Farm right now, but the assumption is they decided we're going to start controlling how our homeowner business develops because that's where they get the big claims. And so the way they decided to do it was not straightforwardly. The straightforward thing to do would be to say, all right, we're withdrawing from the homeowner market in the State of California. We're withdrawing from the homeowner market in California. That product's off the market. They can do that, and they can stick it right back on the market. They go back and forth with the Department of Insurance. But what they decided to do instead was to manipulate it. And so they said to each agent, and this was done nationally, but let's take California. They said, we're not going to take any applications from you for homeowner business, or maybe we're going to let you go up 1%. And it was agent by agent by agent. Now, you can see the problems this causes right away. One agent's got 1,000 policies, one agent's got 5,000. They both can go up 1%. One's a younger guy banking on his growth, just took out a mortgage, had another child. The other guy has been around a long time, is riding on the commissions. You can see all the inequity that can occur here, and you can see the damage that is done to somebody who's built a whole business life on the idea that they will advance their business commensurate with the available potential, which is what the contract says. We said that was a breach of contract for them to do it that way. If they had just taken the product off the market, one could adjust, but manipulating each agent by agent was not the way to do it. They said, we can do it under paragraph 1L. What paragraph 1L actually does, and this whole analysis is in our briefs, 1L says they prescribe underwriting rules, and they said, underwriting rules includes telling each agent which applications we'll take from time to time, regardless of the risk. That's not underwriting rules, and there's a conflict in the evidence. Our expert, McVeigh, their expert is one of their employees, Freeman. Freeman says, that's underwriting rules. McVeigh says, no, it's not. No, it's not. Then they amended the AA-97 contract right in the middle of this. Got the power to do it now. It says, now 1L says we can do this, this, this, and we can do this. Limit applications by agents, by line of business, et cetera. Now, you know right away that they couldn't have possibly have had that power before, and their only answer to it is, no, no, that's just surplusage. You don't amend 17,000 contracts by inserting surplusage. They got the power to do this to the agents in 1997 with the AA-97 contract. The problem is none of these plaintiffs signed it, and they didn't have the power to do it to them. Now, there's the Robinson email, the Henry letter. There's a lot of evidence that underlies all this. But to stay within this time frame, I'd like to jump to just two more subjects. One is the business judgment rule. I believe the district court was somewhat impressed with State Farm's assertion that it could exercise its business judgment to do this. You can't use the business judgment rule to breach a contract. That's our sort of bedrock principle. Forgetting about inconsistencies and how they did it, you can't say, I'm going to breach your contract because it's my business judgment that I should do it. I don't think this business judgment rule and all the loaded rationale about how State Farm was just doing something good for itself and protecting its surplus. That doesn't allow you to breach a contract, not the business judgment rule. Now, finally, then, we have what is, again, technically a backup theory on this count. But here, the backup theory is pretty strong. The backup theory is in case you decide, no, they didn't breach the contract. They can do this to the agents. They can manipulate and limit the applications. It was just surplusage when they got the power to do that in the AA97. Even if that's true, and we presume that, it is, we say, a violation of the covenant of good faith and fair dealing for a State Farm not to let them place this business somewhere else, the business that they supposedly are saying they don't want. And there's a paragraph, 1G, in the contract, and it says, with our consent, you can place business out. And they've used it. They've used it for both governmental business and private business, the Baldwin Mutual example in Alabama. They have used it. So you know there's no hidebound principle that they can't use it. And all the excuses they gave as to why they can't use it here were taken out by a very comprehensive set of admissions. None of it is backed up. No injury, no nothing from their previous use of this, but here they don't want to do it. And then you have the very interesting Wright deposition. Wright is the guy who's now the head of agency. And I asked him, Mr. Wright, why can't they just place this business out if you don't want it, so that they can fulfill their commensurate potential and pay their mortgage or their new child or whatever it is that they're worried about. Why are you cutting off their growth because you've decided you want to manipulate the speed of your growth? And his answer is fascinating. He says, well, you know, that first agent, he may not be able to write it, but the next guy down the street might be able to. So now he's like, shit. Or then he says, by the way, if they've got auto insurance with us and we've sort of got a lock on them, maybe they'll wait. Maybe they'll... It's their homeowner insurance. The 1G argument appears not to have been directly addressed by the district court. Is that right? Yes. The court just seems to say once you're in an at-will situation, the rest of this stuff just flies out the window. Both covenants were handled that way. The disposition in the district court was simply can't have a covenant that contravenes the express provision of the contract. But if you look at both of these, they presume the express provision of the contract that is at issue and then explain why you can have the covenant anyway. I can see why the first one might not work, but it seems you have a better case on the second one on the placement of business. Yes. Because if the implied covenant of good faith and fair dealing deals with that, you were able to show that it was exercised inappropriately or however you want to term that. Yes. It might be in court. Yes. Thumbs up. Thank you, Your Honor. May it please the Court. When the district court was called upon to construe State Farm's contract, both as to termination and as to the exposure management program, it was not writing from a clean slate. On the termination side, as counsel pointed out, there have been a number of cases construing this very contract, this very provision. In those cases, every reported case had uniformly concluded this contract is terminable at will. I like your use of the term reported case. And that's the first step, Your Honor. But going on to the unreported cases, there are three. There is Sandburg, certainly, and that's the one that was the focus for purposes of collateral estoppel. And for purposes of collateral estoppel, one of the issues that's important is what is the stark landscape, as the Court put it, both reported and unreported. And what do those cases show? Those cases show that we have the Scola case, a California appellate decision, unreported, but a California appellate decision. We have all the cases that were reported, and since that time, we have the Drum case, again, another California appellate decision. And for purposes of collateral estoppel, of course, the question is, did the Court abuse its discretion in refusing to apply offensive collateral estoppel to the unpublished memorandum decision in Sandburg? And one of the things the Court pointed out, very obvious, you have all these decisions saying that this is an at-will contract. We have the memorandum decision in Sandburg which says in dicta that it's reasonably susceptible of being read either way, but there's good cause. So we're going to affirm summary judgment. So I'm going to exercise my discretion because of this mess and get a fresh start and just tackle the thing and get on with it. It's not a question of a fresh start. It's a question of we have all this law out there. The fact is it would be inappropriate, the Court determined, to say, I'm going to select this Sandburg dicta and make that dispositive of all of the cases. And remember, this one. So what did the Court do? The Court denied collateral estoppel. And then what did it do? Then it went to the merits. It took a fresh start, looked at the merits, and said? It said this is an at-will contract. And the Court did that because, A, the precedent establishes that. But the Court also looked at the extrinsic evidence. Now, of course, in California, and some of these plaintiffs are from California or California-like states, some of them are for plain-meaning states. Now, for the plain-meaning states such as Texas, the Court looks at the contract. The Court says this at-will, this provision that says the contract is terminable upon written notice is unambiguous. It provides for at-will. And the cases that even counsel pointed to, which he denigrates as saying, well, those are plain, four-corner states, okay, those cases would certainly be persuasive if not dispositive as to those. So that puts those off the equation. But now let's take a look at the California cases where you have to consider extrinsic evidence. Roberts. Well, consider for what purpose? To add a provision that's not there or to illuminate what provisions that are there mean. Well, that's a good question, Your Honor. This is an integrated contract. So you can't look at the extrinsic evidence to add terms. What you can do is to look, and must do, and the Court did, is to look at the extrinsic evidence to say, having looked at that extrinsic evidence, is it possible to view this contract now as being susceptible of one or more meanings? And even there, Your Honor, the cases that have been decided are very instructive because in the reply memorandum, counsel made an interesting observation and concession. Counsel said, you know, you don't have to, because of the nature of this contract, you don't have to look at the negotiations because there are no negotiations. Now, I point out that one of the reasons they said that is because they proffered no evidence that any of these plaintiffs had any understanding that this was anything other than a Nat Will contract. They said, oh, you look at State Farm's intent and you look at his intent back in the mid-1960s. And we agree, and the Court agrees, you can look at State Farm's intent as evidenced by the contract first and foremost, but I say that it's not at the time in the mid-60s because virtually none of these plaintiffs signed the contract in the mid-60s. With one exception, these plaintiffs signed contracts that were developed in the mid-1970s and the early 1980s. Now, what's the significance of that? Well, focusing on State Farm's intent for the moment, we know that the Mooney case was decided in 1972. So their argument requires the following. Well, State Farm intended that the contract be terminable for good cause in 1966, that form, and then when the Mooney court decided it was at will, State Farm sat down and said, you know, we still think it's a good cause contract, but we're not going to do it, and maybe nobody will pay attention to Mooney. I submit the more reasonable analysis is Mooney says this is an at will contract. State Farm's now modifying four or five years later its form contract. If they truly intended it at that time to be a good cause contract, they would have modified the language. You can analogize to a legislature. Court construes a statute. Legislature thereafter reenacts a statute making certain changes, but doesn't change the provision that the court has construed. Principles of statutory construction would say, yeah, the legislature has essentially adopted the court's interpretation. The same is true here. Now, let's look at the extrinsic evidence, and is that inconsistent with that? Not at all. Now, counsel says, well, it used to say with or without cause, and that language was taken out of the version that was in place before 1966. That's not a new argument. That same argument was made by the plaintiff in Bianchi, and the court said, no, that doesn't suggest good cause. And here, again, it was with or without cause. They took out both. It wasn't, as was true in Wallace, the contract saying this contract may only be terminated or may be terminated without cause, and that was pulled out. They pulled out both. Okay. No inference can be drawn, and the court said that. But now we have something else. We have something that pointed to the agency executive manual, and I invite the court to examine that carefully, because counsel has not quite characterized that. It does discuss state farms contract language, but what it says is, you know, we sat down in 1966, and we wanted to make sure that we were fair. We had local agents who were concerned about the fact that their local managers were making arbitrary decisions. Now, we thought about, and expressly says this in the agency executive manual, we thought about adding a good cause provision, but that has problems of its own. We thought about it. We said no. We're not going to do that. Instead, we included a termination review procedure, a procedure that gives us the final say-so, but essentially provides a mechanism, a safeguard. You say, okay, that relates to the 1966 contract. How about the next one, the AA3, which is the one that was adopted in mid-1970s? Take ten seconds and tell me what this termination review is going to – I mean, how does that work? Oh, it's agents' agreement. So I don't know where the AA3 comes up, but the AA660 was the contract form that was developed in the 1960s, 66. AA3 was developed, I believe, in 1976, and the AA4 was the next form contract. But it says we're not going to – you just told us we're not going to add a for cause clause in here, but what we're going to do is have a termination review? Yes, Your Honor. What are they going to review? They are going to review the reasons for the termination. They're going to make sure that, in fact, there's not a local manager who's terminating it for reasons that the company deems inappropriate. They're not going to terminate the contract because they want to give that agent's business to his brother. Well, what does the company consider inappropriate? The company, it varies on a case-to-case basis. For example, certainly things such as stealing funds would be inappropriate. Well, that would be a for cause termination. And many of the reasons that the company would terminate would, in fact, support a good cause. Well, what reasons would they terminate that wouldn't support good cause? Well, now I'm in the range of speculation. But, for example, who knows what a jury would decide what is for cause. But a company might decide, for example, we think that this person is engaged in business practices that we think are inappropriate. We think that this person won't cooperate with the company such that they're going to train. The company can go through a whole number of things saying, you're not doing the things that we expect of a State Farm agent. Now, a judge or a jury may or may not agree with that. And that's exactly the dilemma that State Farm wanted to avoid. State Farm said, we're going to make sure that there's not going to be terminations that we think are inappropriate from the company's perspective. But we are going to retain the final right to decide what is appropriate. But you don't want to go through the burden, expense, and uncertainty and delay of having to prove it in court. Exactly, Your Honor. And that's exactly what the Melnick case talks about. It's exactly what the other cases that talk about the termination review procedure. And the Davis case. The Davis case specifically says, you know, you don't want to penalize an employer from putting together some kind of an internal program, whether it be progressive discipline or an internal review procedure, by saying that you can infer from that that somehow the judges and juries have a role to second-guess that. Now, one other point. And I was on the AA3 contract. And that's the first contract that virtually any of these plaintiffs, I should point out, this is interesting, the one plaintiff that did sign the AA60 contract, the one that was at issue in Mr. Keller's comments, the one that was at issue in the Sandberg case, that was a corporate form of agreement. And the corporate form of agreement doesn't have even a termination review. So all these arguments that relate to the importance of termination review don't even apply to that contract. One other piece of extrinsic evidence, a question-and-answer session that was put together, attached to Mr. Robinson's declaration, who was an executive at State Farm. And what did that say? The question was asked, hey, why don't we include a good cause provision? The answer is no, we're not going to do that. Specifically addressing State Farm's intent, did State Farm intend that this contract be terminable only for good cause? The answer is no. We've got the termination review. We think that's a better approach. Now, you say, well, did the agents know this? What evidence is there in this record as to whether the agents knew this? Well, as I said, the plaintiffs did not proffer any testimony from any of the agents. But State Farm did proffer a number of articles, many of them written by one or more plaintiffs. Those articles made clear they were well aware that this contract was an at-will contract. They were well aware that, in fact, State Farm had in the past exercised that right. Now ---- You know, we're not being asked to determine whether the contract is terminable at will or not. We're just being asked to determine whether summary judgment was appropriate. That's correct, Your Honor. You're being asked to determine whether the court, in construing the contract, okay, properly construed as a matter of law that it was terminable at will. In fact, the ---- if the court looks at extrinsic evidence, and even if the court were to conclude that it is reasonably susceptible of more than one interpretation, even then the court can and is obligated to decide the issue of the contract construction, you know, unless there's a conflict in the extrinsic evidence. In the purely in where decisions that were presented to the court after this case was resolved, in fact, the trial court in that case initially said, you know, I think this contract could be construed a couple different ways. Ultimately, as a matter of law, as a matter of contract construction, ruled that it was an at-will contract. I didn't think it was amenable to summary judgment. That court did not agree, did not think it was amenable to summary judgment, later concluded as a matter of law, considering, I might add, the very same extrinsic evidence that counsel is pointing out, and did conclude, again, as a matter of law. I'd like to address the implied covenant. There's sort of two prongs to this. The first one says the implied covenant can be used to insert a for-cause agreement into contract, even though it's an at-will contract. But the second one says it deals with the alternative placement of business with other carriers. That's the one I'd like you to talk about. Very well, Your Honor. Why doesn't that survive? I mean, it seems, okay, we accept exactly what's in there in the contract, but you've got to exercise that power with good faith and fair dealing on your mind, and we're alleging that you did not. And why isn't that sufficient to get you past summary judgment? Your Honor, the implied covenant of fair dealing essentially says where you have a contract benefit, okay, that a party, you know, cannot take action to deprive you of that benefit, but with one big caveat, unless the contract expressly authorizes that action. If the contract expressly says you can do something, then you can do it. And if it deprives you of a benefit that's otherwise implied in the contract, that's not a breach of the implied covenant. And the Gu's case expressly deals with that. This contract says, and it's the whole premise of the relationship between State Farm and its agents, is that they generally are exclusive agents for State Farm. State Farm trains the agents with that understanding. And the contract creates the possibility, though, that alternative placement of rejected clients with other characters can occur. It does. And in paragraph 1G, it starts out by saying the fulfillment will be your principal occupation and you will not send business to somebody else. Then it makes an exception. Is that exactly how you're reading it? No. I'm sorry, Your Honor. It says, and you will not directly or indirectly write or service insurance for any company other than a State Farm subsidiary or affiliate. Then it goes on to say, or through any governmental or insurance industry plan or facility, okay, just to stop for a second, so when counsel says, well, State Farm has done this with government plans, well, of course. The agent has the absolute right to write business for a government plan. It says so right in the contract. Then it goes on to say, as a further exception to this exclusivity, it says, or for any agent or broker except in accordance with the terms of any written consent we may give you. So it says you cannot write business with any other agent or broker except under the terms of the consent that State Farm might give. It gives State Farm the right to say no. So you're saying there's basically no circumstances under which the implied covenant of good faith and fair dealing can apply to that circumstance. Once you say no, you can do so for any reason. I can't say that there are no circumstances. I can say that the circumstances that are presented in this case. I thought that's what your argument was. If you have the power to say no. You can say no. You can say no, and we don't care why. I mean, you can have the worst reasons in the world, all cognizable in a court of law, but because you have the power to say no and you said no, we don't care what those reasons are. How does that square with the covenant of good faith and fair dealing? It seems to me that the covenant would suggest that under these circumstances you'd have to make these decisions with good faith and in a fair dealing way. Well, again, Your Honor, the covenant of express rights implied obligations. If you have an express right, that trumps implied obligations, and I think that's what the goose case provides. Now, does that mean that State Farm has no limitation on their ability to say no? Now, I can envision circumstances where, for example, a party, State Farm has said, you may proceed to write business for a carrier, and an agent proceeds to take steps to do that, and later State Farm may say, you know, we think this is a bad idea, and then decides to change its mind. That could be in some circumstances, I believe, a breach of the implied covenant, but that's certainly not what we have here. In fact, here what we have is evidence, and the only evidence in this record is from State Farm and State Farm's witnesses, and they explain the reason why we have this provision. There is no evidence here of plaintiffs even coming to State Farm and saying, hey, you know, can you give me the, will you allow me to write this business? Will you let me? And here are the terms of the consent. What we have here is State Farm saying, as a general matter, we're going to have exposure management. And State Farm saying, we train you, you are State Farm agents, and we find that it would be very detrimental to our business to give blanket consent to every agent who can't write additional fire business to let them write for Allstate. And what's the evidence of somebody coming in saying, we want to do this, and State Farm saying, no, you can't? The evidence was just in general terms. There was no incident by incident. The evidence was Mr. Wright was asked in his deposition, does State Farm consent to this? And the answer is, generally speaking, it does not. Why not? Because there are trade secret issues, there are competition issues, there are many business issues where we generally do not consent. Why have the term in there? Pardon me, Your Honor? Why have the term in there? The term is in there because there may well be some circumstances where State Farm would be willing to consent. And in very limited circumstances, for example, if State Farm for the long haul is not going to be offering that business and can work out an appropriate arrangement with its agents and perhaps with its competitor, it may be appropriate then under those terms to consent. State Farm is not ruling out that it will never under any circumstance ever consent, and it has in very limited circumstances in the past done so. But it has done so pursuant to a carefully thought out plan that protects the very legitimate concerns it has, such as trade secret concerns and business concerns. One final issue on the issue of employment. Concerns about the agent is not something it considers. It does. State Farm only markets through its agents. It is critically important to State Farm. What does it do if they can't write further insurance? They say, you know, we only market for you guys, but then you can't write any more insurance and you can't write it for anybody else. So what's an agent supposed to do with a client? Your Honor, take exposure management, for example, because that's the one that is addressed specifically here. Exposure management was not a permanent program, and it did not cover all types of business. An agent was able to continue to write auto business. Actually, so the guy comes and says, you know, I want house insurance. The agent says, I've got a better deal for you. You can buy auto insurance. No, Your Honor. Don't worry about the house, you know. How many clients do you think will go for that? I understand, Your Honor. Clearly, in that situation, that person is not going to be able to rewrite fire insurance by that agent. The point is, a temporary, and exposure management was a temporary program, a temporary suspension of an agent's ability to write fire insurance doesn't negate his livelihood. It doesn't negate the agent's ability to continue to write fire insurance for policyholders that he has. It doesn't negate the ability to write existing and future auto business. And when exposure management is over, that agent, again, has the ability to write business. And the reason State Farm does that is expressly spelled out in Section 1L. Section 1L says State Farm has the right to establish all rules and regulations regarding the assumption of risks. And I realize I'm out of time now, but I think our brief adequately sets forth exactly why that program was put in place in the first place. Okay. Thank you. Thank you. The case is argued and submitted. We'll take a short break before the argument of the last case. Thank you.
judges: B. Fletcher, Kozinski, Trott